**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW HAMPSHIRE**

Diane M. Haggblad

    v.                                      Civil No. 11-cv-028-JL

Michael Astrue, Commissioner
Social Security Administration

**REPORT AND RECOMMENDATION**

Pursuant to 42 U.S.C. § 405(g), Diane Haggblad moves to reverse the Commissioner's decision denying her application for Social Security disability insurance benefits under Title II of the Social Security Act, 42 U.S.C. § 423.  The Commissioner, in turn, moves for an order affirming his decision.  For the reasons that follow, I recommend that the matter be remanded for further proceedings consistent with this report and recommendation.

**Standard of Review**

The applicable standard of review in this case provides, in pertinent part:

> The [district] court shall have power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a rehearing.  The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . . .

42 U.S.C. § 405(g).  However, the court "must uphold a denial of social security disability benefits unless 'the [Commissioner] has committed a legal or factual error in evaluating a particular claim.'"  Manso-Pizarro v. Sec'y of HHS, 76 F.3d 15, 16 (1st Cir. 1996) (quoting Sullivan v. Hudson, 490 U.S. 877, 885 (1989)).

As for the statutory requirement that the Commissioner's findings of fact be supported by substantial evidence, "[t]he substantial evidence test applies not only to findings of basic evidentiary facts, but also to inferences and conclusions drawn from such facts."  Alexandrou v. Sullivan, 764 F. Supp. 916, 917-18 (S.D.N.Y. 1991) (citing Levine v. Gardner, 360 F.2d 727, 730 (2d Cir. 1966)).  In turn, "[s]ubstantial evidence is 'more than [a] mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Currier v. Sec'y of HEW, 612 F.2d 594, 597 (1st Cir. 1980) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)).  But, "[i]t is the responsibility of the [Commissioner] to determine issues of credibility and to draw inferences from the record evidence.  Indeed, the resolution of conflicts in the evidence is for the [Commissioner], not the courts."  Irlanda Ortiz v. Sec'y of HHS, 955 F.2d at 765, 769 (1st Cir. 1991) (citations omitted).  Moreover, the court "must uphold the

[Commissioner's] conclusion, even if the record arguably could justify a different conclusion, so long as it is supported by substantial evidence."  Tsarelka v. Sec'y of HHS, 842 F.2d 529, 535 (1st Cir. 1988).  Finally, when determining whether a decision of the Commissioner is supported by substantial evidence, the court must "review[] the evidence in the record as a whole."  Irlanda Ortiz, 955 F.2d at 769 (quoting Rodriguez v. Sec'y of HHS, 647 F.2d 218, 222 (1st Cir. 1981)).

## Background

The parties have submitted a Joint Statement of Material Facts, document no. 10.  That statement is part of the court's record and will be summarized here, rather than repeated in full.

Haggblad last worked on September 22, 2008.  In December of 2008, Haggblad's primary care physician, Dr. Pamela Deberghes, referred Haggblad to Dr. Sherry Guardiano, a rheumatologist, for a consultation related to myalgia[1] and arthralgia.[2]  On examination, Dr. Guardiano found positive results at twelve of eighteen trigger points and, on that basis, diagnosed Haggblad

---

[1] "Myalgia" is defined as "[m]uscular pain."  Stedman's Medical Dictionary 1265 (28th ed. 2006).

[2] "Arthralgia" is defined as "[p]ain in a joint."  Stedman's, supra, at 159.

with fibromyalgia.[3]  Haggblad applied for Social Security

disability benefits on December 29, 2008.

In a function report she completed in connection with her

application for benefits, Haggblad reported, among other things,

that she: (1) could not stand or walk for more than twenty

minutes at a time; (2) needed to take frequent "sit-down" breaks

when standing or walking; (3) needed to keep a chair nearby on

which to rest her leg when cooking because her legs would go

numb or hurt; (4) could do gardening only with a stool to sit

on; (5) could lift less than ten pounds; (6) could walk about a

quarter mile before needing to rest for two to five minutes; (7)

could not write, paint, sew, or do beading without her hands

going numb and hurting.  In a disability report appended to her

appeal of the initial denial of her claim, Haggblad reported

pain in her legs, arms, hands, and neck, and that being on her

feet for more than ten minutes exacerbated the pain.  She also

reported falling down due to numbness in her legs and dropping

things, like a coffee pot, due to soreness in her hands.

In March of 2009, state-agency consultant Dr. Hugh Fairley

conducted a physical residual functional capacity ("RFC")

assessment of Haggblad, based on a review of all the evidence in

---

[3] "Fibromyalgia" is defined as follows: "A common syndrome
of chronic widespread soft-tissue pain accompanied by weakness,
fatigue, and sleep disturbances; the cause is unknown."
Stedman's, supra, at 725.

her file.  Dr. Fairley concluded that Haggblad was able to: (1) lift twenty pounds occasionally and ten pounds frequently; (2) stand and/or walk (with normal breaks) for about six hours in an eight-hour workday; and (3) sit (with normal breaks) for about six hours in an eight-hour workday.

In addition, Dr. Fairley opined that the symptoms Haggblad alleged were "attributable, in [his] judgment, to a medically determinable impairment," Administrative Transcript (hereinafter "Tr.") 236, and that "[t]he severity of [Haggblad's] symptom(s) and its alleged effect on function [was] consistent, in [his] judgment, with the total medical and nonmedical evidence, including statements by the claimant and others, observations regarding activities of daily living, and alterations of usual behavior and habits," id.  When Dr. Fairley performed his assessment, Haggblad's file contained no medical-source statements about her physical capacities.

In November of 2009, Dr. Deberghes referred Haggblad to Joan Van Saun, an occupational therapist, for an Occupational Therapy Evaluation for Work Capacity.  Van Saun, in turn, collected Haggblad's subjective reports and assessed Haggblad's: (1) endurance for hand/upper extremity use; (2) upper quarter (including cervical range of motion, upper extremity range of motion, and muscular strength); (3) sensation; (4) lumbar range of motion; (5) lower extremity (including active range of

motion, muscular strength, and gait); and (6) postural tolerances.

Van Saun also conducted objective testing of Haggblad's: (1) functional mobility; (2) grip strength (using a Jamar dynamometer); (3) validity of effort (based on rapid-exchange grip strength); (4) fine-motor dexterity (using a nine-hole peg test); (5) repetitive lifting capacity; (6) occasional lifting capacity; (7) maximal lifting capacity (using a wooden box with cut-out hand holds); (8) carry ability/status (using a wooden box with cut-out hand holds and a box with a dowel handle); and (9) push/pull capacity (using a Chatillon dynamometer). Based on the testing she conducted, Van Saun reported that Haggblad: (1) had no capacity to perform repetitive (i.e., more than twelve times per hour) floor-to waist lifting, and had a repetitive lifting capacity for waist-to-shoulder lifting of five pounds; (2) could occasionally (i.e., up to twelve times per hour) lift ten pounds from floor to waist and from waist to shoulder; (3) had a maximum lifting capacity of fifteen pounds for floor-to-waist and waist-to-shoulder lifting, and a maximum lifting capacity of five pounds for shoulder-to-overhead lifting; and (4) could infrequently (i.e., once an hour) carry ten pounds fifty feet.

Based on the information available to her, Van Saun reached the following conclusions:

6

On evaluation, [Haggblad] reported baseline pain level
of 2-3/10 in her thighs and lower legs after
approximately 10 minutes of sitting.  Her pain level
increased with standing and walking for 15 minutes to
5/10, and increased significantly to approximately
8/10 with repetitive squatting.  Her affect, pain
behaviors, body mechanics, and heart rate increase
were all consistent with her report of increase in
symptoms with these activities.  Also, on grip
strength testing she showed consistency of effort.  No
evidence of symptom magnification during today's 2-
hour evaluation.

Endurance for sitting upright is 15 to 20 minutes at a
time; she then needs to stand and walk for 2 to 3
minutes before resuming sitting.  She is able to stand
in one place for 10-15 minutes at a time, walk for 15-
20 minutes at a time.  She was able to perform a
combination of walking and standing for a total of 30
minutes today.  After this prolonged period of
standing and walking she needs to sit, optimally semi-
recline for at least 10 minutes before resuming waking
and standing.  Limiting factor is leg pain and a
feeling of heaviness and weakness in her legs.  She
uses a cane for walking outdoors or for any distances
over 100 feet indoors.

.  .  .  .

Lift capacity: Maximum: floor to waist 10 lbs, waist
to shoulder 10 lbs.[4]  She would be able to lift this
weight on up to Occasional, not Frequent basis.  She
is able to carry a maximum of 10 lbs a distance of 50
feet.  She has significant increase in leg symptoms
with greater distance or weight.

Tr. 358-59.

---

[4] This assessment appears to conflict with Van Saun's data-
collection sheets, which report a maximal lifting capacity of
fifteen pounds for two lifts.  See Tr. 362.  Nowhere, however,
did Van Saun either opine that Haggblad could lift twenty pounds
or report test results that suggest that Haggblad has the
functional capacity to lift twenty pounds.

Also in November of 2009, Dr. Deberghes completed a
Fibromyalgia Residual Functional Capacity Questionnaire on
Haggblad.  She gave the following prognosis: "[F]air-poor.
Would tolerate only part-time sedentary work, few hrs. at a
time."  Tr. 352.  Dr. Deberghes also reported that Haggblad was
not a malingerer.  When asked to identify the clinical findings
on which her responses were based, to describe Haggblad's pain,
and to describe any other limitations Haggblad suffered, Dr.
Deberghes referred to Van Saun's evaluation.

In her RFC questionnaire, Dr. Deberghes listed the
following symptoms: multiple tender points, nonrestorative
sleep, chronic fatigue, morning stiffness, and anxiety.  She
further stated that Haggblad suffered from pain in her thoracic
spine, shoulders, arms, and knees.  Dr. Deberghes said that
Haggblad's experience of pain was "severe enough to interfere
with attention and concentration to perform even simple work
tasks," Tr. 353, during thirty-four to sixty-six percent of an
eight-hour workday, but also said that Haggblad was "[c]apable
of low stress jobs," id.

With regard to specific functional limitations, Dr.
Deberghes opined that Haggblad could: (1) walk one block without
rest or severe pain; (2) sit for twenty minutes at a time before
needing to get up; (3) stand for twenty minutes at a time before
needing to sit down or walk around; (4) sit for a total of two

8

hours (with normal breaks) in an eight-hour workday; (5) stand/walk for a total of two hours (with normal breaks) in an eight-hour workday.  Dr. Deberghes further opined that Haggblad needed to: (1) walk around for five minutes every twenty minutes during an eight-hour workday; (2) shift positions at will from sitting to standing; (3) use a cane for occasional standing/walking; (4) take unscheduled one-hour breaks to lie down with her feet and legs elevated every three or four hours during an eight-hour workday; and (5) have her legs elevated to hip height, in a semi-reclining position, for twenty-five percent of the workday, if she held a sedentary job.

With regard to exertion, Dr. Deberghes opined that Haggblad could occasionally lift and carry up to ten pounds. Finally, Dr. Deberghes said that Haggblad would experience good days and bad days, and would be likely to be absent from work for more than four days per month due to her impairments or treatment.

After Haggblad's claim was denied, she received a hearing before an Administrative Law Judge ("ALJ").  At that hearing, the ALJ received testimony from both a medical expert, Dr. John Axline, and a vocational expert ("VE").  In the area of exertional limitations, Dr. Axline did not testify about Haggblad's capacities for standing, walking or sitting, but,

apparently in reliance on Van Saun's work-capacity evaluation,[5]

had this to say about Haggblad's capacity for lifting:

> [S]he demonstrated she could lift 15 pounds which I
> would say means she could lift 15 pounds frequently.[6]
> Whether she could lift 20 pounds occasionally, if she
> did have osteoarthritis of the neck and did have
> symptoms which were attributed to the osteoarthritis
> of the neck, it might be prudent to as for caution
> limit lifting [to] 20 pounds occasionally.  . . .  So
> I would say if we could assign her limitations I would
> assign 15 pounds frequently, 20 pounds occasionally
> and not require her to have a job which doesn't
> require her to lift very often above her shoulder
> level [sic].

Tr. 27-28.

After the hearing, the ALJ issued a written decision that

includes the following relevant findings of fact and conclusions

of law:

> 3.  The claimant has the severe impairment of
> depression (20 CFR 404.1520(c)).
>
> . . . .
>
> 4.  The claimant does not have an impairment or
> combination of impairments that meets or medically
> equals one of the listed impairments in 20 CFR Part

---

[5] The court presumes that Dr. Axline relied on Van Saun's
evaluation because it is the only functional-capacity in the
record based on actual testing, and it is the only document in
the record that reports a capacity to lift fifteen pounds.

[6] That is a misreading of Van Saun's evaluation, which
reported a maximal lifting capacity of fifteen pounds, and an
occasional lifting capacity of ten pounds.  No reasonable rule
of construction would permit a report of a "maximal lifting
capacity" of fifteen pounds, an "occasional lifting capacity" of
ten pounds, and a "repetitive lifting capacity" of five pounds
to be understood as reporting an occasional lifting capacity of
twenty pounds and frequent lifting capacity of fifteen pounds.

404, Subpart P, Appendix 1 (20 CFR 404.1520(d),
404.1525 and 404.1526).

. . . .

5.  After careful consideration of the entire record,
the undersigned finds that the claimant has the
residual functional capacity to perform light work as
defined in 20 CFR 404.1567(d) except that she can lift
and carry no more than 20 pounds occasionally and 15
pounds frequently and she can stand and walk for about
6 hours in an 8 hour day and sit for about 6 hours in
an 8 hour day.  Further, the claimant has unlimited
use of the hands and feet to operate controls and to
push and pull, can only occasionally perform postural
activities, cannot climb ladders, can occasionally
reach overhead with unlimited ability to feel, finger
and handle; and she must avoid working at unprotected
heights.

. . . .

6.  The claimant is capable of performing past
relevant work as a filter manufacturing assembler.
This work does not require the performance of work-
related activities precluded by the claimant's
residual functional capacity (20 CFR 404.1565).

Tr. 63, 64-65, 67.  In addition to determining that Haggblad was

capable of performing her past relevant work, the ALJ went on to

determine, based on the testimony of the VE, that Haggblad also

had the RFC to perform several other light-duty jobs.

Thereafter, the Decision Review Board ("DRB") modified the

ALJ's decision to add an additional severe impairment,

fibromyalgia.  The DRB, however, went on to rule:

[A]lthough the Decision Review Board acknowledges and
finds that fibromyalgia was a severe impairment, it
does not alter the residual functional capacity
assessment or the finding that [Haggblad] remained
capable of performing [her] past relevant work as a

11

filter assembler.  Accordingly, the Board found that
this information does not provide a basis for changing
the Administrative Law Judge's decision as modified
herein.

Tr. 42.

## Discussion

According to Haggblad, the ALJ's decision should be
reversed or remanded because the ALJ: (1) failed to accord
sufficient weight to the opinion of her treating physician; and
(2) relied on VE testimony that was based on an incomplete
hypothetical question.  Haggblad's first argument is meritorious
and dispositive.

To be eligible for disability insurance benefits, a person
must: (1) be insured for such benefits; (2) not have reached
retirement age; (3) have filed an application; and (4) be under
a disability.  42 U.S.C. §§ 423(a)(1)(A)-(D).  The only question
in this case is whether Haggblad was under a disability.

For the purpose of determining eligibility for disability
insurance benefits,

> [t]he term "disability" means . . . inability to
> engage in any substantial gainful activity by reason
> of any medically determinable physical or mental
> impairment which can be expected to result in death or
> which has lasted or can be expected to last for a
> continuous period of not less than 12 months.

42 U.S.C. § 423(d)(1)(A).  Moreover,

> [a]n individual shall be determined to be under a
> disability only if [her] physical or mental impairment

12

or impairments are of such severity that [she] is not
only unable to do [her] previous work but cannot,
considering [her] age, education, and work experience,
engage in any other kind of substantial gainful work
which exists in the national economy, regardless of
whether such work exists in the immediate area in
which [she] lives, or whether a specific job vacancy
exists for [her], or whether [she] would be hired if
[she] applied for work.  For purposes of the preceding
sentence (with respect to any individual), "work which
exists in the national economy" means work which
exists in significant numbers either in the region
where such individual lives or in several regions of
the country.

42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled for the purpose
of determining eligibility for disability insurance benefits, an
ALJ is required to employ a five-step process.  See 20 C.F.R. §
404.1520.

The steps are: 1) if the [claimant] is engaged in
substantial gainful work activity, the application is
denied; 2) if the [claimant] does not have, or has not
had within the relevant time period, a severe
impairment or combination of impairments, the
application is denied; 3) if the impairment meets the
conditions for one of the "listed" impairments in the
Social Security regulations, then the application is
granted; 4) if the [claimant's] "residual functional
capacity" is such that he or she can still perform
past relevant work, then the application is denied; 5)
if the [claimant], given his or her residual
functional capacity, education, work experience, and
age, is unable to do any other work, the application
is granted.

Seavey v. Barnhart, 276 F.3d 1, 5 (1st Cir. 2001) (citing 20
C.F.R. § 416.920, which outlines the same five-step process as
the one prescribed in 20 C.F.R. § 404.1520).

13

The claimant bears the burden of proving that she is
disabled.  See Bowen v. Yuckert, 482 U.S. 137, 146 (1987).  She
must do so by a preponderance of the evidence.  See Mandziej v.
Chater, 944 F. Supp. 121, 129 (D.N.H. 1996) (citing Paone v.
Schweiker, 530 F. Supp. 808, 810-11) (D. Mass. 1982)).  Finally,

> [i]n assessing a disability claim, the [Commissioner]
> considers objective and subjective factors, including:
> (1) objective medical facts; (2) [claimant]'s
> subjective claims of pain and disability as supported
> by the testimony of the [claimant] or other witness;
> and (3) the [claimant]'s educational background, age,
> and work experience.

Mandziej, 944 F. Supp. at 129 (citing Avery v. Sec'y of HHS, 797
F.2d 19, 23 (1st Cir. 1986); Goodermote v. Sec'y of HHS, 690
F.2d 5, 6 (1st Cir. 1982)).

## A. Weight Accorded to Dr. Deberghes' Opinion

Haggblad argues that the ALJ erred by failing to give the
proper amount of weight to the opinion of Dr. Deberghes and
that, as a result, he ascribed to her an RFC that ignored the
debilitating effects of fibromyalgia on her ability to work.  In
framing that argument, Haggblad points out that the ALJ did not
even consider her fibromyalgia a severe impairment.  In
response, the Commissioner has taken that ball and run with it,
mounting an elaborate defense of the ALJ's reliance on Dr.
Axline's general rejection of fibromyalgia as a valid diagnosis
due to the lack of objective medical signs, and then arguing

14

that any step-two mistake was harmless in light of the DRB's
determination that Haggblad's fibromyalgia was a severe
impairment.  Thereafter, the Commissioner gets to the point,
arguing that the ALJ permissibly accorded significant weight to
the opinion of Dr. Fairley.  In so arguing, the Commissioner
notes the ALJ's mention of: (1) discrepancies between Dr.
Deberghes' opinion and certain information recorded in her
treatment notes; and (2) Dr. Deberghes' reliance on a work-
capacity evaluation performed by a nonacceptable medical source.
The Commissioner further argues that the ALJ's decision to give
little weight to Dr. Deberghes' opinion is supported by both his
determination that Haggblad's complaints about pain and
associated limitations were not credible, and Haggblad's failure
to challenge the ALJ's credibility determination.

     Because the DRB did, in fact, determine that the ALJ erred
by failing to deem Haggblad's fibromyalgia a severe impairment,
there is no need to address either the Commissioner's defense of
the ALJ's step-two determination or the ALJ's reliance on Dr.
Axline's opinion on the validity of fibromyalgia as a diagnosis.
Rather, the court begins by describing the treating-physician
rule, and then turns to the ALJ's decision to credit Dr.
Fairley's opinion over Dr. Deberghes' opinion.  To be as clear
as possible, the specific opinions at issue are: (1) Dr.
Fairley's opinions from March of 2009 that Haggblad could

15

occasionally lift and carry twenty pounds, stand and/or walk for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday, limitations that support an RFC for light work, see 20 C.F.R. § 404.1567(b); and (2) Dr. Deberghes' opinions from November of 2009 that Haggblad could lift no more than ten pounds, stand and/or walk for about two hours in an eight-hour workday, and sit for about two hours in an eight-hour workday, limitations that would preclude an RFC for light work, see id.  At Haggblad's hearing, Dr. Axline offered a partial opinion on her RFC.  It is apparent, however, that the ALJ relied on Dr. Fairley's opinions on Haggblad's functional capacity to the exclusion of Dr. Axline's opinion.[7]

### 1. Treating-Physician Rule

The Commissioner and, by extension, the ALJ, must consider and evaluate all the medical opinions in a claimant's case record.  See 20 C.F.R. §§ 404.1527(b) & (d).  The relevant regulation defines "medical opinions" as "statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [a claimant's] impairment(s), including [a claimant'] symptoms, diagnosis and prognosis, what [a claimant] can still do despite

---

[7] That is a good thing, given Dr. Axline's reliance on a substantial misreading of Van Saun's evaluation.

impairment(s), and [a claimant's] physical or mental restrictions."  20 C.F.R. § 404.1527(a)(2).

Turning to the mechanics of the treating-physician rule, "[i]f any of the evidence in [a claimant's] case record, including any medical opinion(s), is inconsistent with other evidence or is internally inconsistent, [the Commissioner] will weigh all of the evidence."  20 C.F.R. § 404.1527(c)(2).  As a general matter, the Commissioner gives more weight to opinions from examining sources than to opinions from non-examining sources, and the greatest weight of all to opinions from treating sources.  See 20 C.F.R. § 404.1527(d).  When determining how much weight to give the opinion of a treating source, the Commissioner must consider the following factors: (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship; (3) supportability; (4) consistency; (5) the specialization of the treating source; and (6) other factors which tend to support or contradict the opinion.  See 20 C.F.R. § 404.1527(d).

No matter what determination the Commissioner makes regarding the weight to be given a treating physician's opinion, the Commissioner must "always give good reasons in [his] notice of . . . decision for the weight [he gives a claimant's] treating source's opinion."  Id.  "Giving 'good reasons' means

17

providing 'specific reasons' that will allow 'subsequent
reviewers [to know] . . . the weight the adjudicator gave to the
treating source's medical opinion and the reasons for that
weight.'" Kenerson v. Astrue, No. 10-cv-161-SM, 2011 WL
1981609, at *4 (D.N.H. May 20, 2011) (quoting Social Security
Ruling 96-2p, 1996 WL 374188, at *5 (S.S.A. 1996)).  Not only
must the adjudicator's reasons be specific, they must also be
supportable, see Soto—Cedeño v. Astrue, 380 F. App'x 1, 4 (1st
Cir. 2010), and offer a rationale that could be accepted by a
reasonable mind, see Lema v. Astrue, C.A. No. 09-11858, 2011 WL
1155195, *4 (D. Mass. Mar. 21, 2011).

     Notwithstanding the general rule that "generic deference is
reserved for treating source opinions, the regulations also
presuppose that nontreating, nonexamining sources may override
treating doctor opinions, provided there is support for the
result in the record." Shaw v. Sec'y of Health & Human Servs.,
25 F.3d 1037 (unreported table decision), 1994 WL 251000, at *4
(1st Cir. 1994) (citations omitted); see also Berrios Lopez v.
Sec'y of Health & Human Servs., 951 F.2d 427, 431 (1st Cir.
1991) (collecting cases in which opinions of treating physicians
have been properly discounted).  When the Commissioner does not
give controlling weight to the opinion of a treating source, and
subsequently considers the opinion of a state-agency consultant,
he must take into account factors "such as the physician's . . .

medical specialty and expertise in [SSA's] rules, the supporting
evidence in the case record, supporting explanations provided by
the physician . . . and any other factors relevant to the
weighting of the opinions."  20 C.F.R. § 404.1527(f)(2)(ii).
Finally,

> [u]nless a treating source's opinion is given
> controlling weight, the administrative law judge must
> explain in the decision the weight given to the
> opinions of a State agency medical or psychological
> consultant or other program physician, psychologist,
> or other medical specialist, as the administrative law
> judge must do for any opinions from treating sources,
> nontreating sources, and other nonexamining sources
> who do not work for us.

Id.

Here, based on the inconsistencies between the opinions of
Drs. Deberghes and Fairley, there is no argument to be made that
the ALJ erred by failing to give controlling weight to Dr.
Deberghes' opinions.  See 20 C.F.R. § 404.1527(d)(2).  Rather,
the question before the court is whether the ALJ provided
supportable reasons for his decision to give little weight to
Dr. Deberghes' opinions.  He did not.

## 2. The ALJ's Consideration of Dr. Deberghes' Opinions

In his decision, the ALJ explained the weight he gave the
medical opinions of record in the following way:

> [T]he opinion of the state agency medical consultant
> for a range of light exertion work (Exhibit 1F) is
> given significant weight because it embodies
> exertional limitations consistent with the objective

medical findings documented in the evidence of record.
I give little weight to the opinions of Dr. Pamela
Deberghes.  In July 2009, she opined that the claimant
has medical issues that would make it difficult for
her to hold a regular job for more than a few hours at
a time (Exhibits 5F).  In November 2009, for example,
she opined the claimant could only walk for one block;
contrary to the claimant's reports of walking a lot,
and walking twice a week for half a mile; and walking
"a certain distance" (Exhibit 2F).  The opinions are
based on a diagnosis of fibromyalgia, which the
impartial medical expert testified has not been
objectively show[n] to exist.  Of note, the only
mention of trigger points is found in Exhibit 2F, at
page 16.  That same page, however, does not identify
12 subjective responses of tenderness to 12
identifiable trigger points; only hypermobility of the
elbows and muscle spasm are noted.  Further, Dr.
Deberghes' opinion also appears to be based on a
November 2009 work capacity evaluation for less than a
full time sedentary exertion work (Exhibit 7F).  I
give little weight to that work capacity evaluation.
The report is not by an accepted medical source.  The
findings are limited, and based upon the claimant's
self-report and her "work goal" to work part-time.

Tr. 67.  In sum, the ALJ gave three reasons for discounting Dr.

Deberghes' opinions: (1) a perceived contradiction between the

limitations Dr. Deberghes found and the limitations Haggblad

reported to Dr. Deberghes; (2) the fact that Dr. Deberghes'

limitations were based on a diagnosis of fibromyalgia; and (3)

Dr. Deberghes' reliance on Van Saun's work-capacity evaluation.

None of those is a supportable reason for discounting Dr.

Deberghes' opinion.

### a. Reliance on the Diagnosis of Fibromyalgia

The court begins with the ALJ's treatment of Haggblad's

diagnosis of fibromyalgia.  The ALJ rejected Dr. Deberghes'

opinions in part because they were "based on a diagnosis of fibromyalgia, which the impartial medical expert testified has not been objectively show[n] to exist." Tr. 67. At Haggblad's hearing, Dr. Axline expressed considerable skepticism about whether fibromyalgia could ever be diagnosed objectively. Thus, when the ALJ said that a diagnosis of fibromyalgia had not been shown to exist, it is not clear whether he meant to say that fibromyalgia can never be an appropriate diagnosis for purposes of Social Security disability, or that fibromyalgia had not been established in this case. Either conclusion would be erroneous.

Turning first to the validity of fibromyalgia as a diagnosis that could support a claim for Social Security disability benefits, the Court of Appeals for the First Circuit recently pointed out:

> Fibromyalgia is defined as "[a] syndrome of chronic pain of musculoskeletal origin but uncertain cause." Stedman's Medical Dictionary, at 671 (27th ed. 2000). Further, "[t]he musculoskeletal and neurological examinations are normal in fibromyalgia patients, and there are no laboratory abnormalities." Harrison's Principles of Internal Medicine, at 2056 (16th ed. 2005). The American College of Rheumatology nonetheless has established diagnostic criteria that include "pain on both sides of the body, both above and below the waist, [and] point tenderness in at least 11 of 18 specified sites." Stedman's Medical Dictionary, supra.

Johnson v. Astrue, 597 F.3d 409, 410 (1st Cir. 2010). Subsequently, the Johnson court rejected the decision by the ALJ in that case to give little weight to a treating physician's RFC

21

assessment on grounds that the assessment was based on

subjective allegations of pain made by a claimant who had been

diagnosed with fibromyalgia:

> Dr. Ali's "need" to rely on claimant's subjective
> allegations, however, was not the result of some
> defect in the scope or nature of his examinations nor
> was it even a shortcoming.  Rather, "a patient's
> report of complaints, or history, is an essential
> diagnostic tool" in fibromyalgia cases, and a treating
> physician's reliance on such complaints "hardly
> undermines his opinion as to [the patient's]
> functional limitations."  Green-Younger v. Barnhart,
> 335 F.3d 99, 107 (2d Cir. 2003) (internal punctuation
> and citation omitted).  Further, since trigger points
> are the only "objective" signs of fibromyalgia, the
> ALJ "effectively [was] requiring objective evidence
> beyond the clinical findings necessary for a diagnosis
> of fibromyalgia under established medical guidelines,"
> and this, we think, was error.  See id. at 106-07
> (holding that the ALJ erred in rejecting the RFC
> opinion of the claimant's treating physician on the
> ground that, except for the presence of trigger
> points, there was no "objective" medical evidence to
> support such opinion).

Johnson, 597 F.3d at 412; see also Sarchet v. Chater, 78 F.3d

305, 306-07 (7th Cir. 1996).  To the extent the ALJ adopted Dr.

Axline's view that a claimant could never establish disability

due to fibromyalgia, because of the lack of objective support

for such a diagnosis, the ALJ was mistaken.

If, on the other hand, the ALJ was merely suggesting that a

diagnosis of fibromyalgia had not been established in this case,

the DRB's amendment of the ALJ's decision takes that proposition

off the table.  The DRB ruled that Haggblad's fibromyalgia was a

severe impairment which, necessarily, entails a determination

that she actually had fibromyalgia.  And, indeed, in their Joint

Statement, Haggblad and the Commissioner agree that Haggblad

was, in fact, diagnosed with fibromyalgia in accordance with the

diagnostic criteria established by the American College of

Rheumatology.

If this were a case involving a challenge to the ALJ's

step-two determination, an incorrect determination that an

impairment is not severe could have been swept up by a proper

consideration of the limiting effects of the non-severe

impairment at step three.  See, e.g., Carpenter v. Astrue, 537

F.3d 1264, 1265 (10th Cir. 2008) (holding that step-two error

was harmless when the ALJ proceeded to step three); see also

Hickman v. Comm'r of Soc. Sec. Admin., 399 F. App'x 300, 302

(9th Cir. 2010) ("Any error in the ALJ's failure to include a

reading disorder as one of Hickman's severe impairments at step

two of the analysis is harmless.  The ALJ found Hickman suffered

from other severe impairments and, thus, step two was already

resolved in Hickman's favor.") (citing Burch v. Barnhart, 400

F.3d 676, 682 (9th Cir. 2005)); Heatly v. Comm'r of Soc.

Sec., 382 F. App'x 823, 824-25 (11th Cir. 2010).

But here, the ALJ did not just fail to determine that

Haggblad's fibromyalgia was a severe impairment; he determined

either that fibromyalgia is not an impairment at all for

purposes of Social Security disability or that Haggblad did not

23

have fibromyalgia.  Thus, there is every reason to read the
ALJ's decision as rejecting Dr. Deberghes' opinions because they
were based on a diagnosis of fibromyalgia.  In light of Johnson,
and the DRB's determination that Haggblad's fibromyalgia was a
severe impairment, Dr. Deberghes' reliance on a diagnosis of
fibromyalgia is not a supportable reason for rejecting her
opinions on Haggblad's capacity to perform work-related
activities.

### b. Haggblad's Self-Reported Functional Capacity

The ALJ also declined to give much weight to Dr. Deberghes'
opinions because Dr. Deberghes found that Haggblad could walk
only one block while Haggblad herself said that she could walk
"a lot," could walk "for half a mile," and could walk "a certain
distance."  That rationale for rejecting Dr. Deberghes' opinions
is not supported by substantial evidence, i.e., evidence that a
reasonable mind might accept as adequate to support the ALJ's
conclusions.  See Lema, 2011 WL 1155195, at *4.

Regarding her ability to walk, Haggblad: (1) told Dr.
Deberghes in May of 2007, that "she does have some pains
especially in her lateral thighs bilaterally" and that "[t]he
pains in her legs do get worse with a lot of walking," Tr. 281
(emphasis added); (2) told Dr. Deberghes in July of 2008, "that
her legs will bother her, especially if she walks a certain

distance," Tr. 273 (emphasis added); (3) told Dr. Deberghes in
November of 2008, "that occasionally when she was working, she
would be walking and her leg would go numb on the right side,
but then it would come right back" and "that walking does bother
her legs at this time," Tr. 266; (4) told Dr. Guardiano in
December of 2008, that her "legs will go 'numb' when she is
walking," that "they will feel heavy," that she "has had leg
pain for at least 10 years," and that she "walks 1-2 times
weekly for 1/2 mile but has to stop due to pain," Tr. 251
(emphasis added); and (5) told Dr. Deberghes, in January of
2009, that "she has trouble sitting or standing for more than a
short while," that "[s]he has had the leg cramps for years,"
that "occasionally her legs feel like they get rubbery," and
that she had purchased a cane to use while walking, Tr. 244.

    In her initial SSA function report, dated January 30, 2009,
Haggblad reported that could walk or stand for at most twenty
minutes.  In response to the question "How far can you walk
before needing to stop and rest?", Haggblad responded: "1/4
mile?", Tr. 210.  In the disability report she submitted in
support of her appeal of the initial denial of her claim,
Haggblad reported:

> When I get up in the morning I am in so much pain my
> hands are swollen and my legs and hips are in a sharp
> pain.  . . .  Walking and just being on my feet for
> longer than ten minutes starts getting painful.  . . .
> My legs go numb on me so now I am trying a [cane] when

> I have to be on my feet.  . . .  [A]t times I have
> fallen down because my legs went numb.

Tr. 216-17.  At her hearing, Haggblad gave the following
relevant testimony: (1) "I have a hard time standing and
keep[ing] standing and walking around.  My legs get numb and
they're very painful.", Tr. 6; and (2) "[J]ust standing and
walking for any amount of time, it, my legs go numb and I,
sometimes I've fallen down.  I have to use a cane so that I
don't fall down.  It helps me walk.", id.

In the fibromyalgia RFC questionnaire she filled out, Dr.
Deberghes was asked: "How many city blocks can your patient walk
without rest or severe pain?"  Dr. Deberghes responded: "1."

To the extent there is a divergence between the capacity
for walking reported by Haggblad and the functional capacity
reported by Dr. Deberghes – and the court is not at all certain
there is – Haggblad's self-reported capacity for walking is not
a supportable reason for determining that Dr. Deberghes'
opinions are entitled to little weight.  For one thing, the ALJ
has pulled Haggblad's statements about her capacity for walking
way out of context.  Moreover, the ALJ identified nothing in
Haggblad's self reports about walking that in any way undermines
Dr. Deberghes' opinion about how much of a workday Haggblad
could spend on her feet.  The amount of time Haggblad can spend
on her feet, rather than the distance she can walk, is the

26

exertional capacity that goes into determining an RFC. Beyond that, even if Haggblad's self-reported capacity for walking did undermine Dr. Deberghes' opinion about Haggblad's capacity for standing and/or walking, the Commissioner does not explain how Haggblad's self report has any effect on the validity of Dr. Deberghes' opinions about Haggblad's capacities for sitting and lifting. To restate, Haggblad's self reports about walking did not give the ALJ a supportable reason to discount Dr. Deberghes' opinions on Haggblad's functional capacity.

### c. Dr. Deberghes' Reliance on Van Saun's Evaluation

The ALJ's final reason for giving little weight to Dr. Deberghes' opinions is Dr. Deberghes' reliance on the Occupational Therapy Evaluation for Work Capacity conducted by Joan Van Saun. The ALJ's treatment of Van Saun's evaluation is, in reality, rather ambiguous. It is not at all clear whether the ALJ intended to say that he was not giving Van Saun's evaluation very much weight or that he was discounting Dr. Deberghes' opinions because those opinions were based on Van Saun's evaluation. That ambiguity has been resolved, however, by the Commissioner's argument that Van Saun's status as something less than "acceptable medical source" under 20 C.F.R. § 404.1519(a) gave the ALJ good cause to discount Dr. Deberghes' opinions.

Before addressing the merits of that argument, the court notes that the ALJ was incorrect in characterizing Van Saun's evaluation as being based on Haggblad's self reporting.  To be sure, the evaluation does have a section titled "Subjective," Tr. 357, which includes a pain report and a work goal, and it also has a section titled "Subjective Assessment of Home Activities," Tr. 358  But, Van Saun's evaluation also reports the results of no fewer than nine different modes of objective testing.  Thus, Van Saun's evaluation was based on far more than Haggblad's own reports of her physical capacities.

Not only did the ALJ err in his characterization of Van Saun's evaluation, but in addition, the Commissioner provides no legal support for the proposition that Dr. Deberghes' reliance on evidence the ALJ had the discretion to consider or not consider, see 20 C.F.R. § 404.1513(d), gave the ALJ a supportable reason to discount Dr. Deberghes' opinions.  Moreover, Van Saun's evaluation is not some stray medical opinion thrown into the record from left field.  Van Saun evaluated Haggblad on a referral from Dr. Deberghes who, necessarily, had a specific need for Van Saun's evaluation and the background to interpret both Van Saun's opinions and the extensive objective testing on which they were based.  Under the circumstances of this case, the fact that the ALJ was entitled but not obligated to give credence to Van Saun's evaluation was

not a supportable reason for the ALJ to give little weight to
Dr. Deberghes' opinions.  Dr. Deberghes is a physician with the
expertise to draw conclusions from Van Saun's evaluation that
are entitled to the imprimatur of her own status as an
acceptable medical source.

The court certainly appreciates the principle that a
treating physician's report of a claimant's subjective
complaints of pain does not transform those complaints into
either objective medical findings, see Craig v. Chater, 76 F.3d
585, 590 n.2 (4th Cir. 1996), or treating-physician opinions
entitled to deference, see Reeves v. Barnhart, 263 F. Supp. 2d
154, 161 (D. Mass. 2003).  Indeed, "[a]n ALJ may reject a
treating physician's opinion if it is based 'to a large extent'
on a claimant's self-reports that have been properly discounted
as incredible."  Tommasetti v. Astrue, 533 F.3d 1035, 1041 (9th
Cir. 2008) (citing Morgan v. Comm'r Soc. Sec. Admin., 169 F.3d
595, 602) (9th Cir. 1999); Fair v. Bowen, 885 F.2d 597, 605 (9th
Cir. 1989)).  Here, however, Dr. Deberghes' reliance on
objective testing performed by an occupational therapist to whom
she referred Haggblad is a far cry from a treating physician's
report of a patient's subjective complaints of pain.

The court further recognizes that in Green-Younger, the
Second Circuit held that a consulting physician's opinion did
not qualify as substantial evidence in support of an ALJ's

decision to deny benefits when that opinion was based entirely
on a work-fitness evaluation conducted by a physical therapist.
See 335 F.3d at 107-08.  Green-Younger and this case, however,
are distinguishable for many reasons.  While the work-fitness
evaluation in that case, like the work-capacity evaluation in
this case, did not come from an acceptable medical source, see
id. at 107, the Green-Younger court also determined that the
work-fitness evaluation in that case was not substantial
evidence because the physical therapist who wrote it "stated
that her conclusion was based on inconsistent results and
required verification," id., and "a subsequent evaluation
produced contrary results," id.  Van Saun's evaluation suffers
from no such infirmity.  In addition, the doctor who relied on
the work-fitness evaluation in Green-Younger was a state-agency
consultant, not a treating physician interpreting an evaluation
she herself had commissioned.  Dr. Deberghes' reliance on the
evaluation of the occupational therapist to whom she had
referred Haggblad has nearly nothing in common with the non-
examining physician's reliance on a subsequently discredited
evaluation in Green-Younger.

     The bottom line is this.  None of the reasons the ALJ gave
for according little weight to Dr. Deberghes' opinions is
supportable.  Because the ALJ failed to provide a supportable
reason for discounting Dr. Deberghes' opinions, the RFC that

resulted from his decision to give more weight to Dr. Fairley's opinions than Dr. Deberghes' opinions is not supported by substantial evidence.  Accordingly, this case must be remanded.

### B. Other Issues

Having determined that Haggblad is entitled to a remand, the court need not address her remaining argument.  Nonetheless, the court offers the following observations, for the guidance of the parties on remand.

First, the ALJ said in his decision that Dr. Fairley's opinion "embodies exertional limitations consistent with the objective medical findings documented in the evidence of record."  Tr. 67.  That statement would be much more persuasive if the ALJ had identified some specific objective medical finding or findings that supported the limitations described in Dr. Fairley's opinion.

Second, while Dr. Fairley's opinions are evidence of an RFC that would support a determination that Haggblad is not disabled, the evidentiary value of those opinions are at least somewhat diminished by that fact that Dr. Fairley's RFC assessment predated Dr. Deberghes' RFC questionnaire by approximately eight months.  It would be helpful to know whether Dr. Fairley would still opine that Haggblad has the capacity to

31

lift twenty pounds if he had the benefit of Van Saun's evaluation.

Finally, there is the matter of Haggblad's credibility. The Commissioner offers the ALJ's negative credibility assessment as additional support for the ALJ's decision to discount Dr. Deberghes' opinions.  Because the ALJ did not rely on that rationale in his decision, the court need not address it here.  See High v. Astrue, No. 10-cv-69-JD, 2011 WL 941572, at *6 (D.N.H. Mar. 17, 2011); Dube v. Astrue, No. 1:10-cv-179-JL, 2011 WL 742520, at *6 n.15 (D.N.H. Feb. 24, 2011); Laplume v. Astrue, No. 08-cv-476-PB, 2009 WL 2242680, at *6 n.20 (D.N.H. July 24, 2009) ("I cannot uphold the ALJ's decision based on rationales unarticulated in the record.").  Even so, the court notes two potential shortcomings in the ALJ's credibility assessment.  First, it seems to rely to a large extent on the lack of objective medical findings.  But, because objective medical findings are generally absent in fibromyalgia cases, see Johnson, 597 F.3d at 412, the paucity of such findings can hardly count as support for a negative credibility determination.  Second, if the ALJ should happen to assess Haggblad's credibility on remand, he should address page six of Dr. Fairley's RFC assessment, which, at least on the surface, would seem to qualify as support for a positive credibility determination.

## Conclusion

For the reasons given above, I recommend that: (1) the Commissioner's motion for an order affirming his decision, document no. 9, be denied; and (2) Haggblad's motion to reverse the decision of the Commissioner, document no. 7, be granted to the extent that the case is remanded for further proceedings, pursuant to sentence four of 42 U.S.C. § 405(g).

Any objections to this Report and Recommendation must be filed within fourteen days of receipt of this notice.  See Fed. R. Civ. P. 72(b)(2).  Failure to file objections within the specified time waives the right to appeal the district court's order.  See United States v. De Jesús-Viera, 655 F.3d 52, 57 (1st Cir. 2011) (citing United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008)); Sch. Union No. 37 v. United Nat'l Ins. Co., 617 F.3d 554, 564 (1st Cir. 2010) (only issues fairly raised by objections to magistrate judge's report are subject to review by district court; issues not preserved by such objection are precluded on appeal).

SO ORDERED.

_____
Landya McCafferty
United States Magistrate Judge

November 17, 2011
cc:  Bennett B. Mortell, Esq.
     T. David Plourde, Esq.